**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

AJANTA, INC. d/b/a QUALITY INN OF ROME,

                               Plaintiff,

v.                                                 6:16-cv-00309 (BKS/TWD)

ERIE INSURANCE COMPANY,

                               Defendant.
_____

**APPEARANCES:**

Merlin Law Group, P.A.
Jennifer M. Van Voorhis
125 Half Mile Road, Suite 201
Red Bank, NJ 07701
_For Plaintiff_

Rupp Baase Pfalzgraf Cunningham LLC
James Graber
Marco Cercone
424 Main Street
1600 Liberty Building
Buffalo, NY 14202-3616
_For Defendant_

**Hon. Brenda K. Sannes, United States District Judge:**

**MEMORANDUM-DECISION AND ORDER**

## I.    INTRODUCTION

      This breach of contract action arises out of an insurance coverage dispute between

Plaintiff Ajanta, Inc. d/b/a Quality Inn of Rome and Defendant Erie Insurance Company over

damage to the roof of Plaintiff's property, a hotel in Rome, New York.[1]  Plaintiff seeks

compensatory and consequential damages.  (Dkt. No. 2, at 8).  Presently before the Court are:

---

[1] Defendant removed this action from New York state court on the basis of diversity of citizenship under 28 U.S.C. § 1332.  (Dkt. No. 1, at 2).  It is undisputed that New York law applies.

(1) Defendant's motion for summary judgment (Dkt. No. 48); (2) Defendant's motion to strike and to preclude Plaintiff's expert, Steven Thomas (Dkt. No. 49); (3) Plaintiff's motion to strike the testimony of Defendant's expert, James Trevvett (Dkt. No. 50); (4) Plaintiff's motion for oral argument regarding Defendant's motion to preclude Thomas (Dkt. No. 54); and (5) Plaintiff's motion requesting that the Court deny Defendant's motion to preclude Thomas as moot and a limited amount of time to name a new expert (Dkt. No. 58).  For the following reasons, Defendant's motion for summary judgment is granted, Defendant's motion to preclude Plaintiff's expert is denied as moot, and Plaintiff's motions are denied.

## II.   BACKGROUND

### A.   Statement of Material Facts

Local Rule 7.3(a)(3) requires the moving party to file a statement of material facts setting "forth, in numbered paragraphs, each material fact about which the moving party contends there exists no genuine issue."  Each fact "shall set forth a specific citation to the record where the fact is established."  *Id.*  "The opposing party shall file a response to the Statement of Material Facts" mirroring the movant's "by admitting and/or denying each of the movant's assertions in matching numbered paragraphs.  Each denial shall set forth a specific citation to the record."  *Id.* The rule requires the Court to "deem admitted any properly supported facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert."  *Id.*

As part of its motion for summary judgment, Defendant filed a statement of material facts.  (Dkt. No. 48-9).  Plaintiff submitted an attorney declaration with a section entitled "Response to the Statement of Procedural History," (Dkt. No. 53), which appears to respond to defense counsel's declaration, (Dkt. No. 48-1), but has not submitted any response to Defendant's statement of material facts.  Accordingly, the Court deems admitted any properly

supported facts set forth in Defendant's statement of material facts.  Local Rule 7.3(a)(3); *see also Riehl v. Martin*, No. 13-cv-439, 2014 WL 1289601, at *5, 2013 U.S. Dist. LEXIS 186610, at *12, (N.D.N.Y. Dec. 19, 2013) ("Where, as here, a party has failed to respond to the movant's statement of material facts in the manner required under N.D.N.Y. L.R. 7.1(a)(3), the facts in the movant's statement will be accepted as true . . . to the extent they are supported by evidence in the record . . . ."), *report-recommendation adopted by* 2014 WL 1289601, 2014 U.S. Dist. LEXIS 42870 (N.D.N.Y. Mar. 31, 2014).

**B.     Facts[2]**

On or about January 31, 2014, Plaintiff and Defendant entered into a contract for insurance coverage of the hotel, a "two-story structure that is roughly square in shape, with a central courtyard/open pool area in the center" and 104 rooms.  (Dkt. No. 48-9, ¶¶ 1, 4; Dkt. No. 48-2, at 1, 13, 20; Dkt. No. 48-6, at 12).  Plaintiff asserts that, on or about February 21, 2014, the hotel sustained property damage as a result of a snowstorm.  (Dkt. No. 48-9, ¶¶ 5–6).  Mansukh Paghdal, who owns the hotel, testified that, following the snowstorm, the "temperature went up and the water[] melt[ed] everywhere," that approximately 18 hotel rooms were damaged, and that "the problem was from the roof."  (Dkt. No. 48-4, at 67, 71).  Plaintiff filed an insurance claim on March 11, 2014.  (Dkt. No. 48-3, at 28).

On April 14, 2014, James Trevvett, a registered architect whom Defendant had hired, inspected the hotel to determine "the probable cause or causes" of the damage to the hotel roof.  (Dkt. No. 48-5, ¶ 1; Dkt. No. 48-6, at 11).  On June 3, 2014, Trevvett provided a "Roof Condition Report" to Defendant, in which he concluded, among other things:

> The roof areas observed have not been well-maintained. Some of
> the deficiencies are from the roof area's original installation, e.g.,

---

[2] Unless otherwise indicated, the facts have been drawn, to the extent they are supported in the record, from Defendant's statement of material facts.  (Dkt. No. 48-9).

> the wavy and insufficiently lapped seams at Roof Area F, and possibly the omitted conduit support slip sheets found on several roof areas. Other deficiencies, such as the open lap seams, loose wood blocking, inappropriate patch materials, and debris resting directly on the membrane are indicative of a poor or nonexistent annual preventive maintenance program.

(Dkt. No. 48-6, at 11, 16). Trevvett also inspected two water-damaged rooms on the second floor (the top floor) of the hotel. In his report, he noted that "[d]efects in the laps seams, specifically the insufficient seem lap width, and 1/8" or less slope to drain caused the leaks in Roof Area F and is responsible for the corresponding interior water damage." (*Id*. at 16–17). On August 4, 2014, Trevvett provided a supplemental report following a July 3, 2014 on-site meeting with Paghdal, a public adjuster from The Insurance Doctor, and a representative from a roofing company, "to review each of the roof areas and agree to a scope of work." (Dkt. No. 48-6, at 30). In the report, Trevvett opined that the deterioration of the various roof areas were due to "a lack of preventative maintenance" and "attack by animal fats from the restaurant operation."[3] (*Id*. at 30–31).

File notes from Defendant's Claims Management System reflect that the Defendant's adjuster reviewed "agreed roof repairs" totaling $165,015 with Plaintiff's public adjuster for the repair of roof sections A and C–F while noting that one roof section, section B, was "not covered as not related to the storm prior damages and admitted by the insured." (Dkt. No. 53-1, at 2). When the adjuster, Richard Flood, was asked during his deposition about his reference to "agreed roof repairs" Flood responded, "All discussions at this point, because the file is being monitored by home office, is subject to their agreement to when I have a discussion with the public adjuster . . . so these are discussions as to my feelings at the point in time, but have to be approved." (Dkt. No. 55, at 75). A file note dated October 1, 2014, replying to the home office

---

[3] There is a Denny's Restaurant on the property. (Dkt. No. 48-4, at 31).

manager, referenced the "engineer-c[ause] & o[rigin] notes" regarding roof sections A–F, and

states that "we had several inspections to make sure what was going to be covered and what was

not."[4]  (Dkt. No. 53-1, at 3).

Defendant ultimately accepted partial coverage for the claim and issued payment to

Plaintiff in excess of $315,000 for damage to the hotel's interior and exterior but not the roof.

(Dkt. No. 48-9, ¶ 9; Dkt. No. 55, at 108, 117; Dkt. No. 48-3, at 46).  In a letter dated October 10,

2014, Defendant advised Plaintiff that it was denying coverage for roof damage on the basis that

the damage was caused not by weather conditions but by poor maintenance and the age of the

roof:

> We acknowledge your 02-21-2014 loss, reported 3-11-2014,
> claiming ice damage to the roof and interior water damage.
>
> Our investigation of the loss and subsequent review of your policy
> indicates that the claimed ice damages to the roof are not covered.
> We refer you to the report prepared by independent licensed
> engineer James Trevvett . . . .

(Dkt. No. 48-3, at 28).  Defendant described the deterioration, poor maintenance and faulty

workmanship in each of the roof sections.  (*Id.*).  Defendant explained that the "roof damages are

not covered under the terms of the policy," and referred Plaintiff to the following policy

provisions:

---

[4] The file note indicates that the "engineer . . . notes which roof lines are damaged by the ice from the storm and those that are not and are maintenance issues.  They comment [that] roof noted as . . . A, C, D, E, and F were damaged by the storm, B was maintenance and not covered."  (Dkt. No. 53-1, at 3).  It is not clear why this file note appears to refer to engineer notes commenting on sections A and C–F as damaged by the storm, and section B as maintenance and not covered.  That is not consistent with the Trevvett's report or affidavit,  (Dkt. No. 57-1 at 30–31), and the parties have not addressed this.

**SECTION I – COVERAGES**
**INSURING AGREEMENT**

We will pay for direct physical "loss" of or damage to covered property at the premises described in the "Declarations" caused by or resulting from a peril insured against.

**SECTION III - EXCLUSIONS**
    **A.  Coverages 1, 2, 3, 4, and 5**

We do not cover under Building(s) – Coverage 1 . . . "loss" or damage caused directly or indirectly by any of the following. Such "loss" or damage is excluded regardless of any cause or event that contributes concurrently or in any sequence to the "loss":

    1.  Deterioration or depreciation.

    3.  "Loss" or damage caused by or resulting from any of the following:
        a.  By weather conditions, but only if weather conditions contribute in any way with a peril excluded in Part A. of Section III -  Exclusions  to produce the "loss";
        . . . .
        c.  by faulty, inadequate, or defective:
            . . . .
            2)  Design, specifications, workmanship, repair, construction, renovating, remodeling, grading, or compaction;
            3)  Materials used in repair, construction, renovation, or remodeling; or
            4)  Maintenance;
        of property whether on or off the insured premises by anyone, but if "loss" by a peril insured against results, we will pay for the ensuing "loss".

    **B.  Coverages 1, 2, and 3**

We do not cover under Building(s) – Coverage I . . .  "loss" or damage caused:

    1.  By:
        a.  Wear and tear, rust or corrosion;
        b.  Change in flavor, color, texture or finish;
        c.  Damp or dry air;
        d.  Inherent vice;

        f.  Latent or hidden defect;

        g.  Marring or scratching;

        h.  Settling, cracking, shrinking, bulging or expansion of pavements, foundations, walls, floors, roofs, or ceilings;

. . . .

4.  By continuous or repeated seepage or leakage of water or the presence or condensation of humidity, moisture, or vapor, that occurs over a period of 14 days or more.

. . . .

10. To the interior of the building or the contents by rain, snow, sand, or dust, whether driven by wind or not, unless the exterior of the building first sustains damage to its roof or walls by a peril insured against. We will pay for "loss" caused by or resulting from the thawing of snow, sleet, or ice on the building."

(Dkt. No. 48-3, at 29–30).

On or about February 17, 2016, Plaintiff commenced this action seeking damages in excess of $250,000 in connection with Defendant's alleged breach of contract and failure to pay Plaintiff's roof damages claim.  (Dkt. No. 2, at 8).

**C.**    **Trevvett Expert Affidavit**

In support of its theory of causation, Defendant submitted an affidavit by Trevvett, whom it has hired to serve as an expert witness in this case.  Trevvett is a registered architect in the State of New York and has a Bachelor of Science degree in Environmental Design.  (Dkt. No. 48-5, ¶ 2).  Since 2007, Trevvett has "specialized in roof assembly, waterproofing and building-façade investigation, and design and construction administration" and has conducted hundreds of assessments of roof assemblies to determine causes of roof damage.  (*Id*.).

At Defendant's request, Trevvett inspected the hotel roof shortly after Plaintiff reported the roof damage claim "to determine the underlying cause of the damage."  (Dkt. No. 48-5, ¶ 3).  Trevvett's first observation was that the roof "was old – approximately 24-years-old," though he

notes that, according to hotel owner Paghdal, a portion of the roof had been installed in 1997. (*Id.* ¶¶ 5–6). Trevvett notes that the roof is approximately 34,400 square feet in total area and that an EPDM membrane, a "rubber roof," covers the entire roof area. (*Id.*, ¶ 5). Trevvett separates the roof into two areas: "(1) 24,800 square-feet installed in 1990 ('Area One'); and (2) 9,600 square-feet replaced in 2001 ('Area Two')." (*Id.*).

Trevvett describes "the seams throughout"[5] Area One of the roof as "deteriorated" and states that they were "well beyond their useful life as relevant here before February 2014." (Dkt. No. 48-5, ¶ 8). According to Trevvett, "many of the seams on the roof had failed," and there were "wide-open seams that were not adhered to the field of the rubber roof, thus allowing water to enter the roof assembly." (*Id.* ¶ 12).

Trevvett opines that "the damaged roof, which allowed water to enter plaintiff's property, was not caused by a winter storm in February 2014," (Dkt. No. 48-5, ¶ 14), but "was caused by age and wear and tear," (*id.* ¶ 15). He observes that Area One, which was installed in the 1990s, had undergone "direct sunlight and freeze-thaw cycles" causing the "seams and sealant on the plaintiff's roof to deteriorate and to ultimately fail." (*Id.*). Trevvett states that he also observed roof deterioration "where the restaurant hoods discharged grease onto the rubber roof," which, in his opinion, "softened the rubber roof and caused deterioration in the seams." (*Id.* ¶ 16).

Additionally, Trevvett opines that faulty workmanship and inadequate maintenance in Area Two allowed water into the roofing assembly, explaining that there should have been at minimum a two-inch overlap when the EPDM membrane was rolled out, but that there was "about a one-inch overlap at one observed location." (Dkt. No. 48-5, ¶ 20). Trevvett also notes that there was "insufficient pitch to drain (roof slope) of Area Two," which allowed water to

---

[5] Trevvett explains that "EPDM roofs typically are installed by rolling-out and overlapping 6-foot or 10-foor wide sheets of rubber-roofing material. Seam adhesive then is applied to the overlaps/seals to make them waterproof. Seam sealant is applied to the exposed seam edges to avoid moisture penetration." (Dkt. No. 48-5, ¶ 9).

pool in areas with little slope "until the sun, wind, or something else dried it."  (*Id.* ¶ 23).

Trevvett explains that a pool of water remaining for "over 48 hours typically is considered by

industry standards to be detrimental to the integrity of a roof."  (*Id.* ¶¶ 22–23).

Trevvett opines that Area Two of the roof was improperly installed, as demonstrated by

"the insufficient overlaps and insufficient slope."  (Dkt. No. 48-5, ¶ 25).  According to Trevvett,

there was "no evidence to suggest that one storm event in February 2014 caused the overlaps to

become exposed or the pitch of the roof to become insufficient.  In fact, [he] observed rotting

wood in the ceiling of an interior hotel room directly below the roof."  (*Id.*).  Based on these

observations, he concludes that "the deterioration . . . to the wood occurred over a prolonged

period of time."  (*Id.*).

Trevvett avers that he found "patches for asphalt-based roofs – not rubber roofs," which,

in his opinion, was evidence of inadequate maintenance, (Dkt. No. 48-5, ¶ 26), and a hole where

"someone pulled out a pipe from the roof" but did not patch and which "naturally allowed water

to enter the roof assembly."  (*Id.* ¶ 27).  Trevvett further states:

> It is my professional opinion that the underlying cause of the
> damage I observed to plaintiff[']s roof in April and July 2014 was
> not a February 2014 winter storm as plaintiff alleges.  Rather, to a
> reasonable degree of certainty in my field of expertise, it was wear
> and tear, age, inadequate maintenance, faulty workmanship during
> the installation of the roof, deterioration, and improper installation,
> among other things, that caused the damage.

(*Id.* ¶ 30).

## III.   MOTION TO PRECLUDE DEFENDANT'S EXPERT

Relying on the opinions of its expert, James Trevvett, Defendant argues that it is entitled

to summary judgment because the actual cause of the roof damage was "not a single storm, but

rather years of wear and tear, deterioration, neglect, faulty workmanship, and improper

maintenance," which is not covered, and that Plaintiff, whose expert has withdrawn from this case,[6] has offered no evidence raising a material issue of fact about the cause of the roof damage. (Dkt. No. 48-8, at 5–6).  Plaintiff moves to preclude Trevvett as an expert in this case because: (1) as an architect, and not an engineer, Trevvett is not qualified to "opine as to what constitutes a 'reasonable degree of engineering certainty'"; (2) Trevvett's opinions are not based on scientific testing but Trevvett's own observation and speculation.  (Dkt. No. 50-1, at 7–8).

With respect to expert testimony, the Court is charged with a "gatekeeping" obligation under Rule 702 of the Federal Rules of Evidence: the trial judge must ensure "that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand."  *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 580 (1993).  Rule 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.  "To determine whether a witness qualifies as an expert, courts compare the area in which the witness has superior knowledge, education, experience, or skill with the subject matter of the proffered testimony."  *United States v. Tin Yat Chin*, 371 F.3d 31, 40 (2d Cir. 2004).  "Under *Daubert*, factors relevant to determining reliability include the theory's testability, the extent to which it has been subjected to peer review and publication, the extent to which a technique is subject to standards controlling the technique's operation, the known or potential rate of error, and the degree of acceptance with the relevant scientific community."

---

[6]Because Plaintiff's expert, Steven Thomas, has withdrawn from this case and Plaintiff has withdrawn his affidavit, (Dkt. No. 58-1; Tr. Ct. Proceeding June 23, 2017, at 13-14; Dkt. No. 53-4), Plaintiff's request (Dkt. No. 58) that Defendant's motion to strike Thomas' affidavit and preclude his testimony (Dkt. No. 49) be denied as moot is granted.  Plaintiff's motion for oral argument (Dkt. No. 54) on Defendant's motion to preclude is denied as moot as well.

*Restivo v. Hessemann*, No. 14-cv-4662, 2017 WL 218006, at *18, 2017 U.S. App. LEXIS 948, at

*64 (2d Cir. Jan. 19, 2017) (internal quotations marks omitted).  The reliability inquiry is "a

flexible one," *Daubert*, 509 U.S. at 594, and the factors to be considered "depend[] upon the

particular circumstances of the particular case at issue," *Kumho Tire Co., Ltd. v. Carmichael*, 526

U.S. 137, 150 (1999).

 Plaintiff contends that, because Trevvett is not an engineer, he is not qualified to offer an

opinion "to a reasonable degree of engineering certainty."  (Dkt. No. 50-1, at 7–9).  Further,

Plaintiff argues that, because it is based on speculation and unreliable methodology, Trevvett's

report regarding causation is insufficient to establish the appropriate bases for the opinions stated

therein.  (*Id.*).  Plaintiff's objections are not well-founded.  A careful examination of Trevvett's

qualifications reveal extensive experience conducting hundreds of roof inspections, as well as

participation in sixty to seventy roofing continuing education classes in the last five years, some

of which covered assessment of roof damage, which is at issue in this case.  (Dkt. No. 50-5, at

31, 52).  Further, Trevvett is a registered architect who has specialized knowledge in roof

assembly and has prior experience rendering expert opinions to insurance companies where roof

damage has been in dispute.  (Dkt. No. 51, at 7; Dkt. No. 50-5, at 56–58, 66–67).  The fact that

Trevvett is not an engineer is not dispositive of this motion.  The requirement for an expert

witness is that he or she must have "superior knowledge, education, experience, or skill with the

subject matter of the proffered testimony."  *Tin Yat Chin*, 371 F.3d at 40.  In light of Trevvett's

experience, it is clear that he possesses the requisite knowledge to support his expert opinion.

 Further, Trevvett's report is reliable because it is supported by appropriate validation.  A

reading of Trevvett's deposition and report indicates that he "walked all areas of the roof,"

physically probed the seams of the roof, photographed and measured the roof, and gathered

information about the property from Plaintiff's public adjuster, Plaintiff's principal, and

"Firestone Building Products to verify when the roof was installed based on an observed

Firestone label on the membrane."  (Dkt. No. 50-3, at 12, 19–26; Dkt. No. 50-5, at 71, 73).

Plaintiff argues that Trevvett's opinion is based on speculation, as he did not perform testing on

the roof.  (Dkt. No. 50-1, at 7–8).  Trevvett directly addressed this concern in his deposition.

(*See* Dkt. No. 50-5, at 83, 100).  The following is an excerpt from his deposition:

> Q.    Now, how could you determine the causation if you don't
>       perform any type of tests?
>
> A.    Well, I did actually go inside the building and there is
>       evidence of the water that has been leaking for a long
>       period of time. It was rotted wood, which does not happen
>       over a period of time. So that led me to conclude that my
>       opinion is that it had been leaking for some period of time.
>       And wasn't a recent leak.
> . . . .
> Q.    Could that have better qualified the finding by doing an
>       infrared survey or in some other type of testing?
>
> A.    Additional testing destructive or non-destructive would
>       have quantified how much water was in the assembly. But
>       it wouldn't of – beyond that it wouldn't have helped
>       quantify how much water was on the assembly, but it
>       would not have changed the opinion or the
>       recommendations for remediation.

(Dkt. No. 50-5, at 83, 100).  Trevvett's report, and his deposition testimony, demonstrate a

detailed investigation, conclusions supported by keen observation, and compliance with an

established methodology.  (*See* Dkt. No. 50-3, at 10–27; Dkt. No. 50-5, at 7–13).  For these

reasons, the Court finds that Trevvett's testimony contains sufficient indicia of reliability and is

not speculative.  Thus, the Court denies Plaintiff's motion to preclude Trevvett's testimony.

**IV.     MOTION FOR SUMMARY JUDGMENT**

 **A.     Standard of Review**

 Under Federal Rule of Civil Procedure 56(a), summary judgment may be granted only if all the submissions taken together "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323.  A fact is "material" if it "might affect the outcome of the suit under the governing law," and is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *see also Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (citing *Anderson*).  The movant may meet this burden by showing that the nonmoving party has "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322; *see also Selevan v. N.Y. Thruway Auth.*, 711 F.3d 253, 256 (2d Cir. 2013) (summary judgment appropriate where the non-moving party fails to "come forth with evidence sufficient to permit a reasonable juror to return a verdict in his or her favor on an essential element of a claim" (internal quotation marks omitted)).

 If the moving party meets this burden, the nonmoving party must "set out specific facts showing a genuine issue for trial." *Anderson*, 477 U.S. at 248, 250; *see also Celotex*, 477 U.S. at 323–24; *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009).  "When ruling on a summary judgment motion, the district court must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the

movant." *Dallas Aerospace, Inc. v. CIS Air Corp.*, 352 F.3d 775, 780 (2d Cir. 2003).  Still, the

nonmoving party "must do more than simply show that there is some metaphysical doubt as to

the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986),

and cannot rely on "mere speculation or conjecture as to the true nature of the facts to overcome

a motion for summary judgment," *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir. 1986)

(quoting *Quarles v. Gen. Motors Corp.*, 758 F.2d 839, 840 (2d Cir. 1985)).  Furthermore,

"[m]ere conclusory allegations or denials . . . cannot by themselves create a genuine issue of

material fact where none would otherwise exist."  *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir.

2010) (quoting *Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1456 (2d Cir. 1995)).

## B.      Analysis

Defendant seeks summary judgment contending that the policy does not provide

coverage because the damage to the hotel roof was caused by deterioration, faulty workmanship,

and improper maintenance.  (Dkt. No. 48-8, at 5–6, 9–10).  Plaintiff opposes Defendant's motion

and contends that Defendant's partial payment of its claim, which covered interior damage, is

sufficient to defeat summary judgement, as this payment, in conjunction with the policy

language, supports a finding that the roof damage was caused by a snowstorm and is therefore a

covered loss.  (Dkt. No. 53-2, at 6–7).

"Insurance policies are, in essence, creatures of contract, and, accordingly, subject to

principles of contract interpretation."  *Porco v. Lexington Ins. Co.*, 679 F. Supp. 2d 432, 435

(S.D.N.Y. 2009) (quoting *In re Estates of Covert*, 97 N.Y.2d 68, 76 (2001)).  "In determining a

dispute over insurance coverage, [New York courts] first look to the language of the policy,"

give the language its "plain and ordinary meaning," and construe ambiguities in favor of the

insured.  *Selective Ins. Co. of Am. v. Cty. of Rensselaer*, 26 N.Y.3d 649, 655–56 (2016) (quoting

cases).  "A contract is unambiguous if the language it uses has a definite and precise meaning, unattended by danger of misconception in the purport of the [agreement] itself, and concerning which there is no reasonable basis for a difference of opinion."  *Id.* (alteration in original) (quoting *Greenfield v. Philles Records*, 98 N.Y.2d 562, 569 (2002)) (internal quotation marks omitted).  Indeed, when a contract "on its face is reasonably susceptible of only one meaning, a court is not free to alter the contract to reflect its personal notions of fairness and equity."  *Id.* (quoting *Greenfield*, 98 N.Y.2d at 569–570).

Plaintiff contends that, because "there exists a material issue of fact as to what caused the loss," it would be "premature" to grant "summary judgment on an exclusion in the policy." (Dkt. No. 53-2, at 4).  Under New York law, "[a]n 'all-risk' policy allows recovery 'for all losses not resulting from misconduct or fraud unless there is a specific policy provision excluding coverage of the loss in express terms' policy."  *U.S. Dredging Corp. v. Lexington Ins. Co.*, 99 A.D.3d 695, 695–96 (2d Dep't 2012) (quoting *Roundabout Theatre Co. v. Cont'l Cas. Co.*, 302 A.D.2d 1, 6 (1st Dep't 2002)).  "An insured seeking to recover for a loss under an insurance policy has the burden of proving that a loss occurred and also that the loss was a covered event within the terms of the policy."  *Id.* at 696 (quoting *Vasile v. Hartford Acc. & Indem. Co.*, 213 A.D.2d 541, 541 (2d Dep't 1995)); *see also Int'l Multifoods Corp. v. Commercial Union Ins. Co.*, 309 F.3d 76, 83 (2d Cir. 2002) ("[A]n all-risk insured, has the burden of establishing a prima facie case for recovery by proving (1) the existence of an all-risk policy, (2) an insurable interest in the subject of the insurance contract, and (3) the fortuitous loss of the covered property." (quoting *Int'l Multifoods Corp. v. Commercial Union Ins. Co.*, 178 F. Supp. 2d 346, 350 (S.D.N.Y. 2001))).  "[T]he insurer [then] has the burden of proving the applicability of an exclusion."  *Platek v. Town of Hamburg*, 24 N.Y.3d 688, 694 (2015).

There is no dispute that the policy at issue in this case is an all-risk policy.  The policy states: "We will pay for direct physical 'loss' of or damage to covered property at the premises . . . caused by or resulting from a peril insured against."  (Dkt. No. 48-2, at 37).  Under "Perils Insured Against," the policy lists "Building(s)" and states that "[t]his policy insures against direct physical 'loss', except 'loss' as excluded or limited in this policy."  (*Id*. at 41).  Here, Plaintiff has adduced evidence that a loss (damage to the roof) occurred to covered property (the hotel).  Indeed, "[t]he burden on the insured with respect to demonstrating a fortuitous loss under an 'all-risks' policy such as the CU Policy is relatively light: 'All risk coverage covers all losses which are fortuitous no matter what caused the loss, including the insured's negligence, unless the insured expressly advises otherwise.'"  *Int'l Multifoods Corp. v. Commercial Union Ins. Co.*, 309 F.3d 76, 83 (2d Cir. 2002).  Thus, Defendant must show "that the loss occurred through a specifically excluded peril."  *ABI Asset Corp. v. The Twin City Fire Ins. Co.*, No. 96-cv-2067, 1997 WL 724568, at * 1, 1997 U.S. Dist. LEXIS 18265, at *3 (S.D.N.Y., Nov.18, 1997).

"When insurance contracts contain an exclusion provision, '[t]he insurer generally bears the burden of proving that the claim falls within the scope of an exclusion . . . [by] establish[ing] that the exclusion is stated in clear and unmistakable language, is subject to no other reasonable interpretation, and applies in the particular case.'"  *Lantheus Med. Imaging, Inc. v. Zurich Am. Ins. Co.*, 255 F. Supp. 3d 443, 453 (S.D.N.Y. 2015) (quoting *Seneca Ins. Co. v. Kemper Ins. Co.*, No. 02-cv-10088, 2004 WL 1145830, at *10, 2004 U.S. Dist. LEXIS 9159, at *28 (S.D.N.Y. May 21, 2004)).

In this case, the policy unambiguously states: "We do not cover . . . 'loss' or damage caused directly or indirectly by any of the following.  Such 'loss' or damage is excluded regardless of any cause or event that contributes concurrently or in any sequence to the 'loss':

. . . [d]eterioration or depreciation . . . faulty, inadequate, or defective [maintenance] . . . [and] [w]ear and tear."  (Dkt. No. 48-3, at 29–30).  Plaintiff argues that because the policy  "states that the interior damages will only be paid if first the roof or walls sustain a loss by a peril insured against," Defendant's payment  for the interior damages to a number of hotel rooms, demonstrates "[a]t the very least  . . . an ambiguity in the policy, which, under New York law, should be interpreted in the insured's favor."  (Dkt. No. 53-2, at 6–7).  This provision, however, is a separate subsection of the policy concerning interior damage, and fails to show any ambiguity with respect to the exclusions at issue.  Accordingly, the Court turns to the issue of causation.

Here Defendant contends that the damage to the roof falls within the scope of the policy's exclusion of loss due to deterioration; faulty, inadequate, or defective maintenance; and wear and tear.  In support of its contention, Defendant has submitted Trevvett's affidavit and reports, in which he opines "to a reasonable degree of certainty in [his] field of expertise, [that] it was wear and tear, age, inadequate maintenance, faulty workmanship during the installation of the roof, deterioration, and improper installation, among other things, that caused the damage" to the roof.  (Dkt. No. 48-5, ¶ 30).  Plaintiff, having withdrawn its expert, does not point to any evidence in the record showing what caused the damage to the roof.

Plaintiff argues that because Defendant paid for the interior damages to a number of hotel rooms, the "roof must have sustained damage the result of a covered loss."  (Dkt. No. 53-2, at 7).  But the policy provision on which Plaintiff relies refers to a covered loss to the roof "or walls."  The policy excludes coverage to the interior of the building "unless the exterior of the building first sustains damage to its roof *or walls* by a peril insured against."  (Dkt. No. 48-2, at 44), (emphasis added).  And Plaintiff's assertion that there was no evidence of damage to the exterior

17

walls is without support.  Defendant has cited to evidence that it paid for "exterior damage to [the] stucco walls."  (Dkt. No. 55-1, at 8; *see* Dkt. No. 55 at 108 (damages to the exterior stucco and interior were all paid); Dkt. No. 117 (check to Plaintiff for partial payment for "exterior siding repairs")).

There is evidence that leaks in the roof caused interior water damage.  (Dkt. No. 48-6 at 16–17).  In his first report, Trevvett indicated that "[d]efects in the laps seams, specifically the insufficient seem lap width, and 1/8″ or less slope to drain *caused the leaks in Roof Area F and is responsible for the corresponding interior water damage*."  (*Id.*) (emphasis added).  The damaged roof, In Trevvett's opinion, "was not caused by a winter storm in February 2014."  (Dkt. No. 48-5, ¶ 14).  In any event, any potential dispute regarding a different coverage issue, i.e., whether Defendant was obligated to pay for interior damages under these facts, is immaterial.  It is not evidence that a factfinder could utilize to determine what caused the roof damage in this case.

Further, Defendant's exclusion of coverage for deterioration, faulty workmanship, and improper maintenance are long-held, legitimate justifications for an insurer's denial of coverage.  *See U.S. Dredging Corp.*, 99 A.D.3d at 696 ("Since wear and tear, deterioration and collapse . . . were explicitly excluded from coverage under the policy, the plaintiff's evidence did not establish coverage under the policy for the loss."); *Copacabana Realty LLC v. Fireman's Fund Ins. Co.*, No. 10-2919, 2013 WL 1934361, 2013 N.Y. Misc. LEXIS 1877, at *7 (N.Y. Sup. Ct. Suffolk Cnty. Apr. 29, 2013) ("AAIC established its prima facie entitlement to summary judgment dismissing the complaint by demonstrating that its defective or inadequate workmanship exclusion clearly and unambiguously applies to plaintiff's property damage."); *Luttenberger v. Allstate Ins.*, 470 N.Y.S.2d 988, 989 (Dist. Ct. Suffolk Cnty. 1984) ("Accordingly, it is this court's opinion that the faulty construction of the eaves falls within the

definition of a latent defect thereby excluding coverage under the homeowner's policy."). Considering the uncontroverted evidence that the roof damage was caused by wear and tear and poor maintenance, and the policy's unambiguous exclusion for such damage, the Court concludes there are no material issues of fact requiring trial.  Thus, Plaintiff has failed to raise an issue of fact with respect to causation of roof damage.

As a final matter, the Court notes that interspersed throughout Plaintiff's opposition papers are references to Defendant's alleged "agreement" to pay for roof damages. (Dkt. No. 53-1, at 2).  Plaintiff has, however, cited only to internal claims file notes of the adjuster, when insurance coverage required management approval, and Defendant denied coverage for the roof. (Dkt. No. 53-2, at 7; Dkt. No. 55, at 75).  Plaintiff has not, as Defendant observes, "pled, pursued, or otherwise properly put [the issue of estoppel] before this Court."  (Dkt. No. 55-1, at 7).[7]

Accordingly, Defendant's motion for summary judgment is granted.

## V.      CONCLUSION

For these reasons, it is hereby

**ORDERED** that Defendant's motion for summary judgment (Dkt. No. 48) is

**GRANTED** in its entirety; and it is further

---

[7] "[I]n New York an insured may equitably estop an insurer from asserting coverage defenses when the 'insurer acts in a manner inconsistent with a lack of coverage, and the insured reasonably relies on those actions to its detriment.'"  *Lumbermens Mut. Cas. Co. v. Flow Int'l Corp.*, 844 F. Supp. 2d 286, 301 (N.D.N.Y. 2012) (quoting *Burt Rigid Box, Inc. v. Travelers Prop. Cas. Corp.*, 302 F.3d 83, 95 (2d Cir. 2002)); *see also K. Bell & Assocs., Inc. v. Lloyd's Underwriters*, 827 F. Supp. 985, 989 (S.D.N.Y. 1993) ("To properly plead equitable estoppel the party seeking its protection must allege: (1) lack of knowledge of the true facts; (2) reliance on the conduct of the party to be estopped; and (3) a prejudicial change in its position.").  Plaintiff has not asserted that it reasonably relied on the adjustor's views to its detriment. While Plaintiff has submitted a letter dated October 6, 2014, from a public adjuster to Defendant, on Plaintiff's behalf, indicating that Plaintiff hired a contractor in reliance on Defendant's "offer of settlement," (Dkt. No. 53-1 at 5), there is no evidence of an "offer of settlement," and Paghdal testified that he had repairs made to the damaged portion of the roof in September 2015 – nearly a year after the denial.  (Dkt. No. 48-4, at 80).  The only evidence of an expenditure by Plaintiff for the roof prior to Defendant's October 2014 denial was a $1,593.30 roof repair in March 2014, (Dkt. No. 48-4, at 76), and there is no evidence that this was done in reliance on any conduct by the Defendant, or that Plaintiff would have handled that repair differently if Defendant had disclaimed coverage at that point.

**ORDERED** that Defendant's motion to strike and preclude Plaintiff's expert, Steven Thomas (Dkt. No. 49) is **DENIED AS MOOT**; and it is further

**ORDERED** that Plaintiff's motion to strike Defendant's expert, James Trevvett (Dkt. No. 50), is **DENIED**; and it is further

**ORDERED** that Plaintiff's motion requesting oral argument regarding Steven Thomas (Dkt. No. 54) is **DENIED AS MOOT**; and it is further

**ORDERED** that Plaintiff's motion requesting Defendant's motion to preclude Steven Thomas as an expert be denied as moot (Dkt. No. 58) is **GRANTED**; and it is further

**ORDERED** that the Clerk is directed to enter Judgment accordingly and close this case.

**IT IS SO ORDERED**.

Dated:  March 8, 2018
Syracuse, New York

Brenda K. Sannes
U.S. District Judge

20